1
2
3
4
5                    IN THE UNITED STATES DISTRICT COURT

6                      FOR THE DISTRICT OF ARIZONA

7
   UNITED STATES OF AMERICA,        )
8                                   )
              Plaintiff,            )
9                                   )          No. CR 08-874-TUC-CKJ
   vs.                              )
10                                  )               **ORDER**
   OSMIN ANTONIO ALAS,              )
11                                  )
              Defendant.            )
12  _____)

13          On or about January 5, 2009, Magistrate Judge Jennifer C. Guerin issued a Report and

14  Recommendation [Doc. # 55] in which she recommended the Court deny Defendant's

15  Motion to Dismiss Indictment for Failure to Preserve Material Exculpatory Evidence [Doc.

16  # 36].  The Report and Recommendation notified the parties that they had ten days to file any

17  objections.  Defendant has filed an objection.  Also pending before the Court is Defendant's

18  Objection to Order Denying Motion to Produce [Doc. # 70].

19

20  *Factual and Procedural Background*

21          On July 9, 2008, Osmin Antonio Alas ("Alas") was indicted on one count of

22  Possession with Intent to Distribute 100 to 1,000 kilograms of Marijuana.  On October 27,

23  2008, Alas filed a Motion to Dismiss for Failure to Preserve Material Exculpatory Evidence.

24  Evidence was presented to the magistrate judge on December 2, 2008.

25          At the December 2, 2008, hearing before the magistrate judge, Agent Brek Haymore

26  ("Haymore") testified that, on June 10, 2008, he was stationed at the primary inspection area

27  of a temporary Border Patrol checkpoint on SR-82 near Sonoita, Arizona, and made contact

28  with Alas who was driving a tractor trailer rig.  The bill of lading that Alas gave to Haymore

1    referred to a serial number for a bolt-type lock or seal (SS 3394284).  Haymore referred Alas

2    to secondary inspection.

3            Haymore testified that he had been trained about locks/bolt seals and that it was his

4    understanding that the function of a bolt seal is "to detect if the cargo has been tampered

5    with."  December 2, 2008, hearing transcript ("TR").  15:17-23.  He further testified that he

6    had been taught that, when investigating a tractor/trailer that the bolt seal number should be

7    matched against the bill of lading.  Haymore testified that, if the bolt seal number matches

8    the bill of lading, it may suggest that the load may be in order; in this case, however,

9    Haymore's suspicions would have remained because of a canine alert.  Haymore further

10   testified if the bolt seal number did not match the bill of lading, it would raise a red flag.

11           Haymore stayed by the tractor while Agent Eduardo Gonzalez ("Gonzalez")

12   questioned Alas.  Haymore testified that he never saw the bolt seal, he did not try to check

13   the bill of lading against the bolt seal, he did not know who cut the bolt seal off of the trailer,

14   and no one took a bolt seal into evidence.

15           Border Patrol Agent Adrian Blaine ("Blaine") testified that he retrieved the bolt

16   cutters after being directed to by supervisor Agent Nunley.  Blaine testified that he did not

17   see the bolt seal being cut off and did not recall which agent cut the bolt seal.

18           Agent Gonzalez testified that his canine alerted to the tractor trailer being driven by

19   Alas.  He further testified that he looked at the bill of lading, but was not sure when he did

20   so.  Gonzalez also testified that he did not remember seeing the bolt seal before it was cut off.

21   It was Gonzalez' understanding, at the time of the incident, that the purpose of a bolt seal was

22   "to ensure that the load stays intact from start to finish . . ." and that the load has not been

23   "tampered with."  TR 56:1-8.

24           Gonzalez testified that, when contacted by the United States Attorney's Office

25   regarding Alas' Motion to Dismiss, he remembered that he may have picked up the bolt seal.

26   Gonzalez recalled that he had "picked it up the next morning, approximately 24 hours later

27   after it was cut[,]"  TR 58:21-22, because he wanted to keep a souvenir because it was the

28   "largest marijuana load" he had seized.  TR 60:4-8.  Gonzalez placed the bolt seal in a night

1   stand at home.  Gonzalez testified that "lacking experience in putting cases together such as

2   this one, [he] didn't think that the lock would be important in a case like this in proving guilt

3   or innocence."  TR 59:17-24.  Gonzalez testified that, when he picked up the bolt seal, he

4   thought it was related to the arrest of Alas, that he did not treat the bolt seal as evidence, and

5   that, although prior to being called by the prosecutor, the thought that the bolt seal might be

6   evidence in this case "crossed [his] mind[,]" he did not speak to other agents or anyone

7   involved in the investigation about finding the bolt seal prior to November 12, 2008.  TR

8   73:23 - 74:1.  However, Gonzalez also testified that, when he retrieved the bolt seal, took it

9   home, and placed it in his night stand, he did not "ever consider it to have any kind of

10  evidentiary value in this case[.]"  TR 86:3-4.  The number on the bolt seal retrieved by

11  Gonzalez is SS 3394845.  *See* Defendant's Ex. 4.

12          Gonzalez also testified that, when he testified at a prior hearing on October 3, 2008,

13  he did not remember that he had picked up the bolt seal.  On October 3, 2008, Gonzalez had

14  testified that he did not know what happened to the bolt seal.  Nonetheless, on December 2,

15  2008, Gonzalez testified that the bolt seal was important to him as a souvenir and that it was

16  something that stuck out in his mind because it symbolized his biggest seizure of marijuana.

17          On January 16, 2008, Alas filed a Motion for Production of Work Record of Agent

18  Gonzalez for June 11, 2008.[1]  On December 2, 2008, Haymore testified that Gonzalez was

19  on duty at the Sonoita station for only one day, on June 10, 2008, while Gonzalez has

20  testified that he retrieved the bolt seal while on duty on June 11, 2008.  On January 7, 2009,

21  the prosecutor advised counsel for Alas that, while CBP attempted to locate the work records

22  for Gonzalez for June 11, 2008, such documents have not been located.  Alas requested an

23  order requiring the United States Attorney to disclose any records that indicate whether or

24  not Gonzalez was assigned to the Route 82 checkpoint in Sonoita, Arizona on June 11, 2008.

25  On January 27, 2009, the magistrate judge denied the request.  On February 3, 2009,

26

27          [1]The Court has reviewed the recording of the January 26, 2009, hearing before the
28  magistrate judge regarding this motion.

- 3 -

1   Defendant filed an Objection to Order Denying Motion to Produce.

2

3   *Report and Recommendation*

4          The magistrate judge found that the bolt seal was not material and exculpatory but,

5   rather, concluded that the bolt seal was potentially useful evidence.  The magistrate judge

6   considered that the failure to preserve potentially useful evidence does not violate due

7   process "unless a criminal defendant can show bad faith on the part of the police." *Arizona*

8   *v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).  Finding that Alas

9   had failed to meet his burden to show that the failure to preserve the bolt seal was an act of

10  bad faith, the magistrate judge recommended that this Court deny Alas' Motion to Dismiss

11  for Failure to Preserve Material Exculpatory Evidence [Doc. # 36].

12

13  *Alas' Objections to the Report and Recommendation*

14         Alas asserts that the evidentiary value of the bolt seal was immediately apparent

15  because the bolt seal had a serial number on it that could have been matched to the bill of

16  lading.  He asserts that the significance of the bolt seal did not depend on microscopic or

17  scientific examination.  Rather, it was material evidence and, therefore, the government had

18  a duty to preserve this evidence "that might be expected to play a significant role in [Alas']

19  defense." *California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413

20  (1984).  Alas asserts that this evidence possessed "an exculpatory value that was apparent

21  before the evidence was destroyed" and was "of such a nature that [Alas is unable] to obtain

22  comparable evidence by other reasonably available means." *Id*. at 489.

23         Alas also asserts that bad faith has been shown because the bolt seal was discarded

24  despite the fact that the evidentiary value was apparent.  Alas asserts, therefore, that the

25  charges against him should be dismissed whether under the *Trombetta* or *Youngblood*

26  standard.

27

28

- 4 -

*Determination of Evidence as Material and Exculpatory or Potentially Useful – Due Process*

Where evidence exculpatory to a defendant is lost or destroyed, a defendant's due process rights may be implicated. *Youngblood*, 488 U.S. at 57-59. The government has a duty to preserve evidence if (1) the evidence is material and exculpatory in nature, (2) the exculpatory value of the evidence is apparent before the evidence is destroyed, and (3) the defendant is unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489. However, if the evidence is not material and exculpatory in nature but is instead "potentially useful evidence," failure to preserve the "potentially useful evidence" does not violate due process "unless a criminal defendant can show bad faith on the part of the police." *Youngblood*, 488 U.S. at 57.[2]

Generally, evidence is material and exculpatory if it is clearly favorable to the accused, such as the confession of a co-defendant or a victim's criminal record supporting a defendant's claim of self-defense. *United States v. Agurs*, 427 U.S. 97, 114 (1976); *see also United States v. Brady*, 373 U.S. 83, 87 (1963). "Potentially useful evidence" is evidence that "could have been subjected to tests, the results of which might have exonerated the defendant," such as Breathalyzer samples or seized cocaine. *See Illinois v. Fisher*, 540 U.S. 544, 546 (2004); *see also Youngblood*, 488 U.S. at 57.

In *Youngblood*, the Supreme Court dealt with the prosecution's failure to preserve semen samples. In that case, neither the prosecution nor the defense knew the results of potential testing of the semen samples when the police "failed to perform certain tests or to refrigerate the boy's clothing." *Id*. at 56 n. *. The Court found that the unpreserved evidence did not meet the standard required by *Trombetta* because the "possibility that the semen

---

[2]In discussing *Youngblood*, the Ninth Circuit has stated that *Youngblood* "dealt with failure to *preserve* rather than failure to *gather* potentially exculpatory evidence." *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989), *emphasis added*, *citing Youngblood*, 109 S.Ct. at 337. However, the court determined that the "bad faith failure to *collect* potentially exculpatory evidence would violate the due process clause." *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989), *emphasis added*; *see also United States v. Garcia*, 37 F.3d 1359, 1366 (9th Cir. 1994).

1   samples could have exculpated [defendant] if preserved or tested is not enough to satisfy the

2   standard of constitutional materiality." *Id*. Indeed, the Court reiterated that *Trombetta*

3   requires a defendant to show that the police knew the semen samples would have exculpated

4   him "*before* the evidence was destroyed." *Id*.

5        In this case, neither the prosecution nor the defense *know* that the bolt seal retrieved

6   by Gonzalez was the bolt seal removed from Alas' trailer. Therefore, neither the prosecution

7   nor the defense know the results of a comparison test between the trailer's bolt seal and the

8   bolt seal number listed on the bill of lading. Rather, the parties only know that the bolt seal

9   retrieved by Gonzalez does not match the bill of lading. The possibility that, if the bolt seal

10  had been preserved at the time of the search, it *could* exculpate Alas if preserved for

11  comparison is not enough to satisfy the standard of constitutional materiality. Indeed, no

12  agent testified that he knew the bolt seal number matched the bill of lading when the bolt seal

13  was not taken into evidence on June 10, 2008. Moreover, Haymore testified that, even if the

14  bolt seal number matched the bill of lading in this case, his suspicions would have remained

15  because of the canine alert. In other words, the alleged exculpatory nature of the bolt seal

16  was not apparent. Indeed, Alas' reliance on *United States v. Cooper*, 983 F.2d 928 (9th Cir.

17  1993), does not take into consideration that the potentially exculpatory value of the evidence

18  at issue in *Cooper* was repeatedly suggested to the government agents (e.g., parole officer

19  and landlord reported claims of legitimacy of lab) and that the court determined that the

20  government agents acted in bad faith, 983 F.2d at 931. In this case, the potentially

21  exculpatory value of the bolt seal was not pointed out to the government or the agents until

22  the filing of the motion to dismiss.

23       Alas' assertion that the evidentiary value of the bolt seal was immediately apparent

24  because the bolt seal had a serial number on it that could have been matched to the bill of

25  lading fails to recognize that, under *Trombetta*, the issue is not whether evidentiary value is

26  immediately apparent, but rather, whether the *exculpatory value* of the evidence is apparent

27  before the evidence is destroyed. *Trombetta*, 467 U.S. at 489. Alas' argument that the

28  evidence was not merely "potentially useful" because it did not depend on microscopic or

1  scientific examination, similarly fails to recognize that *Youngblood* did not require that the
2  subjection of the evidence to testing required scientific or microscopic testing.  For example,
3  in *Villafuerte v. Stewart*, 111 F.3d 616 (9th Cir. 1997), the court considered  the officers'
4  failure to obtain fingerprints from certain areas of the crime scene under *Youngblood* and
5  determined that failure to preserve that evidence did not constitute bad faith.  The court
6  pointed out that "a negligent investigation does not violate [a defendant's] due process
7  rights."  111 F.3d at 625.  The comparison of the number on the bolt seal to the number on
8  the bill of lading is similar to a comparison of a fingerprint taken at a crime scene to a
9  suspect's fingerprint.[3]  *See also United States v. Smith*, 534 F.3d 1211 (10th Cir. 2008)
10 (where defendant argued that, because government had not recorded the serial numbers from
11 bills of money, she could not establish that she did not "turn over" large sums of money
12 quickly; the court found the serial numbers were not exculpatory).

13 The Court agrees with the magistrate judge's conclusion that the bolt seal was
14 potentially useful evidence.

15

16 *Requirement of Bad Faith*

17 Under *Youngblood*, the failure to preserve the "potentially useful evidence" does not
18 violate due process "unless a criminal defendant can show bad faith on the part of the
19 police."  488 U.S. at 57.  Alas has the burden to show bad faith on the part of the agents.  *Id.*,
20 at 58; *see also Mitchell v. Goldsmith*, 878 F.2d 319, 322 (9th Cir. 1989) (failure to preserve
21 evidence of which no more can be said than it could have been subjected to tests, the results
22 of which might have exonerated the defendant, is not a denial of due process unless a
23 criminal defendant can show bad faith).  Alas asserts that bad faith has been shown because
24 the bolt seal was discarded despite the fact that the evidentiary value was apparent.
25 However, to show bad faith, a defendant must not merely show that evidentiary value was

26

27
28      [3]The Court does not find that, simply because fingerprint analysis may require more of
        a microscopic comparison, this analogy is not applicable.

- 7 -

1   apparent, but the exculpatory value of the evidence must be apparent.  *Id.*  Indeed, the

2   "Supreme Court made clear in *Trombetta* and *Youngblood* that the dispositive issue for due

3   process purposes is the state of mind of police or prosecutors at the time the evidence is lost

4   or destroyed."  *Richter v. Hickman*, 521 F.3d 1222, 1235 (9th Cir. 2008), *citations omitted*.

5   The agents' failure to immediately place the bolt seal into evidence and Gonzalez' failure to

6   turn over the bolt seal until contacted by the prosecutor does not establish, when those

7   failures occurred, that the agents knew the evidence "would have exculpated [Alas.]"

8   *Youngblood*, 488 U.S. at 56 n *.

9          The Court agrees with the magistrate judge's conclusion that Alas has failed to show

10  that the agents acted in bad faith.

11

12  *Objection to Order Denying Motion to Produce*

13         This Court reviews the magistrate judge's Order denying the Motion for Production

14  under a "clearly erroneous or contrary to law" standard.  28 U.S.C. § 636(b)(1)(A).  In fact

15  "[t]he reviewing court may not simply substitute its judgment for that of the deciding court."

16  *Grimes v. City and County of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991) (discussing

17  Fed.R.Civ.P. 72(a) and 28 U.S.C. § 636(b)(1)(A)).  The Ninth Circuit Court of Appeals has

18  more fully explained this Court's role in reviewing such a decision:

19         As to nondispositive matters, the Magistrates Act provides only that the district court
            "may reconsider any pretrial matter . . . where it has been shown that the magistrate's
20         order is *clearly erroneous* or *contrary to law*." [Citations omitted.] There is no formal
            procedure specified for a review of a nondispositive order by the district court.  The
21         Magistrates Act thus treats them differently [than dispositive issues].  Further, the
            Magistrates Act's specification that nondispositive matters are to be reviewed by the
22         district court under a far more deferential standard – "clearly erroneous" and
            "contrary to law" – than dispositive matters indicates that decisions by the magistrate
23         judge on  nondispositive matters are essentially "final decisions of the district court
            which may be appealed in due course with other issues."  *United States v. Brown*, 79
24         F.3d 1499, 1504 (7th Cir. 1996) (stating but then rejecting this proposition without
            further discussion); *see also [Thomas v. Arn*, 474 U.S. 140, 151 n. 10, 106 S.Ct. 466,
25         88 L.Ed.2d 435 (1985)] (indicating that Congress "clearly intended [a magistrate
            judge's ruling on a nondispositive motion) to be final unless a judge of the court
26         exercises his ultimate authority to reconsider the magistrate's determination."
            (internal quotations omitted)).
27
    *United States v. Abonce-Barrera*, 257 F.3d 959, 968 (9th Cir. 2001).
28

- 8 -

1   Fed.R.Crim.P. 16 requires the government to disclose to a defendant, upon his request,

2   any documents or objects that are material to preparing the defense or that the government

3   intends to use in its case-in-chief at trial. *United States v. Cedano-Arellano*, 332 F.3d 568,

4   571 (9th Cir. 2003); *see also* Fed.R.Crim.P. 16(a)(1)(E).  "To obtain discovery under

5   [Fed.R.Crim.P. 16], a defendant must make a prima facie showing of materiality." *United*

6   *States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990), *citing United States v. Little*, 753 F.2d

7   1420, 1445 (9th Cir. 1984).  Evidence is material under Rule 16 if it is "relevant to the

8   development of a possible defense," *Mandel*, 914 F.2d at 1219, *citation and internal*

9   *quotations omitted*, or if it will "enable the accused to substantially alter the quantum of

10  proof in his favor," *United States v. Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976); *see also*

11  *United States v. Santiago*, 46 F.3d 885 (9th Cir. 1995) ("threshhold showing of materiality

12  requires a presentation of 'facts which would tend to show that the Government is in

13  possession of information helpful to the defense"), *citing Mandel*, 914 F.2d at 1219.  Courts

14  have distinguished between evidence that is exculpatory, and thus discoverable under *Brady*

15  *v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and evidence that is

16  material and, therefore, discoverable under Fed.R.Crim.P. 16.  *See e.g., United States v.*

17  *Messerlian*, 832 F.2d 778, 795 (3rd Cir. 1987) ("under Rule 16(a)(1)(D), the information that

18  the government must disclose need not be exculpatory; it merely must be material to the

19  preparation of the defense"); *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978)

20  ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial

21  obligation"); *United States v. Kaplan*, 554 F.2d 577, 579-80 (3rd Cir. 1977) ("where

22  documentary evidence is exculpatory, it may be within both *Brady* and Rule 16, but

23  nonexculpatory records are obtainable in advance of trial only by virtue of Rule 16").

24  However, a court is to consider whether a request would be unduly burdensome in light of

25  the materiality shown. *Mandel*, 914 F.2d at 1219.

26  Alas made his request for documents pursuant to Fed.R.Crim.P. 16(a)(1)(E).  In

27  denying the Motion for Production, the magistrate judge stated that "the standard of

28  materiality is whether the evidence would affect the outcome of the trial."  January 27, 2009,

1    Order [Doc. # 65], p. 2.  In stating the standard, the magistrate judge relied on *United States*

2    *v. Gross*, 603 F.2d 757, 759 (9th Cir. 1979).  However, *Gross* stated that, where a specific

3    request was made "the standard of materiality is whether the evidence 'might have affected

4    the outcome of the trial.'"  603 F.2d at 759; *quoting United States v. Agurs*, 427 U.S. at 104.[4]

5    The magistrate judge having considered the Motion for Production under the wrong standard,

6    the Court will reconsider the Motion.

7         In his Objection, Alas asserts that the government has produced two records, neither

8    of which state that Gonzalez was at the Sonoita station on June 11, 2009.   *See* Doc. # 67,

9    Ex. A and B.  Further, Alas asserts that the records conflict with each other as to the times

10   Gonzalez worked on that date.[5]   During the hearing on the Motion to Produce, the

11   government asserted that the documents established that Gonzalez was detailed away from

12   the Naco station on June 11, 2008.  Alas proffered the testimony of a retired Border Patrol

13   supervisor who would have testified that when an agent is detailed from Naco to Sonoita, the

14   G-481 for Sonoita should reflect that fact; G-259s for Naco and Sonoita, radio logs, and radio

15   transmission recordings would similarly reflect that information.  However, the government

16   asserts that the G-481 may only refer to agents normally assigned to Sonoita, so if the

17   Sonoita G-481 fails to include reference to Gonzalez, such failure would not establish that

18   Gonzalez was not at the Sonoita station on June 11, 2009.  Alas asserts that, because

19   Gonzalez relies on the temporal proximity to the arrest of Alas for his belief that the bolt seal

20   came from Alas' trailer, the requested records, if they do not establish that Gonzalez was

21   assigned to Sonoita on June 11, 2008, are material to whether the bolt seal obtained by

22   Gonzalez was the bolt seal cut from Alas' trailer.   Therefore, Alas asserts that these

23   ───────────────

24        [4]The Court notes that Alas argues that the *Gross* court was discussing discovery under
     *Brady*.  The court in *Gross* did not specify if the request made by defendant for disclosure of
25   certain records, files and reports was pursuant to *Brady*, Fed.R.Crim.P. 16, or some other basis
     (*e.g., Giglio v. United States*, 405 U. S.150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)
26   (nondisclosure of evidence affecting credibility may fall within *Brady*).

27        [5]The government asserts this discrepancy is, in effect, the result of administrative/clerical
28   efforts to simply record the number of hours worked, rather than the specific hours worked.

1   documents are not simply for impeachment.

2       The government also asserts that the declaration of Supervisory Border Patrol Agent

3   David Barker establishes that Gonzalez was working at the Sonoita Station from 12:00 a.m.

4   to 8:00 a.m. on June 11, 2008.  However, this declaration does not include any foundation

5   for Barker's statement (e.g., independent recollection, review of documents).  The Court

6   finds the declaration of Barker does not affect the materiality of the documents requested by

7   Gonzalez.

8       The Court finds that the evidence requested by Alas is "relevant to the development

9   of a possible defense[.]" *Mandel*, 914 F.2d at 1219, *citation and internal quotations omitted*.

10  Further, Alas has made a showing that the government is in possession of information helpful

11  to the defense.  *Santiago*, 46 F.3d at 894.  However, the court must consider whether the

12  disclosure would be unduly burdensome in light of the materiality shown.  *Mandel*, 914 F.2d

13  at 1219.

14      Alas asserts that the G-481 is maintained on a computer and can quickly and easily

15  be produced by the Border Patrol.  The government has not disputed this.  The government

16  argued during the January 26, 2009, hearing that further production would be burdensome

17  and outside the scope of discovery requirements because Gonzalez has already testified as

18  to where he was working on June 11, 2008, and the documents already produced by the

19  government verify his testimony.  However, the documents appear to merely not contradict

20  Gonzalez (i.e., the records establish Gonzalez was not at Naco on June 11, 2008, but do not

21  establish where he was).  Moreover, if the Court were to accept the government's assertion

22  that the records verify Gonzalez' testimony, that would necessarily mean that they contradict

23  Haymore's testimony.[6]  The Court finds the burden to the government, considered in light

24  of the materiality shown by Alas, does not warrant a denial of the motion.

25

26

27

28      [6]The Court notes that the government argues that Haymore was not responsible for
    knowing Gonzalez' assignment/location.

- 11 -

Accordingly, IT IS ORDERED:

1.      The Report and Recommendation [Doc. # 55] is ADOPTED.

2.      Defendant's Motion to Dismiss Indictment for Failure to Preserve Material Exculpatory Evidence [Doc. # 36] is DENIED.

3.      Defendant's Objection to Order Denying the Motion for Production [Doc. # 70] is SUSTAINED.

4.      The January 27, 2009, Order denying the Motion for Production is VACATED.

5.      The Motion for Production of Work Record of Agent Gonzalez for June 11, 2008, is GRANTED.

6.      The government shall disclose the Sonoita G-481 for June 11, 2008, to Alas. If the G-481 does not address Gonzalez' presence at the Sonoita station on June 11, 2008, the government shall disclose at least one document, if in existence, that establishes Gonzalez' location on June 11, 2008, including but not limited to:  (1) the G-259s for Naco and Sonoita; (2) radio logs, and/or; (3) radio transmission recordings.

7.      The government shall make the disclosure of the G-481 or alternate document within twenty (20) days of this Order.

DATED this 26th day of February, 2009.



_____
Cindy K. Jorgenson
United States District Judge